**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 20-_____ (___)<br><br>Bankruptcy Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**OPENING BRIEF IN SUPPORT OF THE DEBTORS'
MOTION TO FIX VENUE FOR CLAIMS RELATED TO BANKRUPTCY
UNDER 28 U.S.C. §§ 157(b)(5) AND 1334(b)**

SIDLEY AUSTIN LLP
Jessica C. K. Boelter
William E. Curtin
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

– and –

SIDLEY AUSTIN LLP
Thomas A. Labuda
Michael C. Andolina
William A. Evanoff
Matthew E. Linder
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donna L. Culver (No. 2983)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile:  (302) 425-4664

*Proposed Attorneys for the Debtors and Debtors in Possession*

Dated: March 3, 2020
Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

ARGUMENT ............................................................................................................................6

    I.     THE PAAs SHOULD BE TRANSFERRED TO THIS COURT UNDER § 157(b)(5). .........................................................................................................6

    II.    THIS COURT HAS JURISDICTION OVER THE PENDING ABUSE ACTIONS. ................................................................................................................9

         A.    The BSA Parties Share an Identity of Interest ...........................................10

             1.    Shared Purpose and Common Mission .........................................11

             2.    The BSA's Lead Role in Litigating Pending Abuse Actions ........13

         B.    Shared Insurance Impacts the Debtors' Estates .........................................14

         C.    Claims Against Local Councils and Chartered Organizations are Inextricably Intertwined With Claims Against the BSA ...........................15

             1.    The PAAs Arise Out of a Common Nucleus of Claims and Allegations and Raise Substantially Similar Questions of Fact and Law ...............................................................................................16

             2.    The BSA Is a Necessary Participant in Any Ongoing Litigation Against Local Councils and Chartered Organizations ..................17

    III.   THIS COURT SHOULD NOT ABSTAIN FROM EXERCISING ITS JURISDICTION. ..............................................................................................19

CONCLUSION ........................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.H. Robins Co. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ........................................................................ *passim*

*Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)*,
   175 B.R. 847 (Bankr. D. Del. 1994) ................................................................16

*Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*,
   372 F.3d 154 (3d Cir. 2004).............................................................................9

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)................................................................................18, 19

*Coker v. Pan Am. World Airways, Inc.. (In re Pan Am. Corp.)*,
   950 F.2d 839 (2d Cir. 1991).........................................................................9, 10

*In re Combustion Eng'g*,
   391 F.3d 190 (3d Cir. 2005) .............................................................................12

*ConocoPhillips Co. v. SemGroup, L.P. (In re Semcrude, L.P.)*,
   428 B.R. 82 (Bankr. D. Del. 2010) ....................................................................10

*Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*,
   111 B.R. 423 .......................................................................................................15

*In re Fed.-Mogul Glob., Inc.*,
   300 F.3d 368 (3d Cir. 2002).............................................................................12

*In re Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
   177 B.R. 475 (D. Del. 1993)..............................................................................18

*Gisinger v. Patriach*,
   No. 16 Civ. 1564 (ER), 2016, WL 6083981 (S.D.N.Y. Oct. 18, 2016)...................15

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
   No. 06-CV-5358, 2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ...........................18

*Hopkins v. Plant Insulation Co.*,
   342 B.R. 703 (D. Del. 2006).............................................................................7

*In re Imerys Talc Am., Inc.*,
   No. 19-mc-103(MN), 2019 WL 3253366 (D. Del. July 19, 2019) .........................12

i

*Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn. (In re Dow Coming Corp.),*
  86 F.3d 482 (6th Cir. 1996) ........................................................................... *passim*

*Majestic Star Casino v. City of Gary (In re Majestic Star Casino, LLC),*
  Adv. No. 10-50841 (KG), 2010 WL 2540457 (Apr. 24, 2010) (Mem. Order.)...........................16

*In re Marcus Hook Dev. Park, Inc.,*
  943 F.2d 261 (3d Cir. 1991)....................................................................................9

*In re Montreal Me. & Atl. Ry., Ltd.,*
  No. 1:13-MC-00184-NT, 2014 WL 1155419 (D. Me. Mar. 21, 2014) ..............................8, 14

*Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),*
  365 B.R. 401 (S.D.N.Y. 2007).................................................................................18

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.,*
  496 B.R. 256 (D. Mass. 2013) .................................................................................8

*In re Nutraquest, Inc.,*
  No. 03-5869 (GEB), 2004 U.S. Dist. LEXIS 29143 (D.N.J. Mar. 5, 2004).......................8, 20

*Pacor, Inc. v. Higgins,*
  743 F.2d 984 (3d Cir 1994)....................................................................................9

*In re Phila. Newspapers, LLC,*
  407 B.R. 606 (E.D. Pa. 2009) .............................................................................13, 16

*Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.),*
  676 F.3d 45 (2d Cir. 2012) ...................................................................................14

*In re Triad Grp., Inc.,*
  Case No. 13-C-1307, 2015 WL 12843204 (E.D. Wis. Feb. 17, 2015)....................................7

*Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC),*
  460 B.R. 644 (E.D. Pa. 2011) ................................................................................16

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
  591 F.3d 164 (3d Cir. 2009)..................................................................................10

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
  386 B.R. 17 (Bankr. D. Del. 2008) ......................................................................11, 12

*Welded Constr., L.P. v. Williams Cos. (In re Welded Constr., L.P.),*
  609 B.R. 101 (Bankr. D. Del. 2019) ........................................................................20

**Statutes**

28 U.S.C. § 157(b)(5) .....................................................................................2, 6, 20

ii

28 U.S.C. § 1334(b) ...................................................................................................9

28 U.S.C. § 1334(c) ...............................................................................................19, 20

## Other Authorities

Order Under Sections 105(a) and 362 of the Bankruptcy Code Extending the
    Automatic Stay to the Parishes to Prevent the Continuation of Certain Personal
    Injury Actions, *In re Catholic Diocese of Wilmington, Inc.*,
    Case No. 09-13560 (CSS) (Bankr. D. Del. Feb. 4, 2010)...................................11, 12

Transcript of August 16, 2017 Hearing, *TK Holdings Inc. v. Hawaii (In re TK
    Holdings Inc.)*, Adv. No. 17-50880-BLS (Bankr. D. Del. Aug. 23, 2017) ............................3, 12

Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*,
    41 U.C. DAVIS L. REV. 1613 (2008) ......................................................................7

Georgene Vairo, *Mass Torts Bankruptcies: The Who, the Why and the How,*
    78 AM. BANKR. L.J. 93 (2004) ................................................................................7

ACTIVE 254920731v.3

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully submit this opening brief in support of their motion (the "Motion") for an order under 28 U.S.C. §§ 157(b)(5) and 1334(b) fixing venue in this Court for the personal injury abuse claims identified in Exhibit A to the Motion (collectively, the "Pending Abuse Actions" or "PAAs"). The PAAs include claims filed against the BSA, Learning for Life ("LFL"),[2] and against other entities that have been chartered by the BSA, including local councils that are independently incorporated under the non-profit laws of their respective states (collectively, the "Local Councils") and community and religious organizations, businesses, and groups of citizens that organize Scouting units (collectively, the "Chartered Organizations," and together with the Debtors, LFL, and the Local Councils, the "BSA Parties") in (1) state courts (the "State Court Actions") and (2) federal courts, all alleging abuse arising out of the victim's involvement or connection with the BSA.[3]

## PRELIMINARY STATEMENT

Under 28 U.S.C. §§ 157(b)(5) and 1334(b), which are designed to be employed in mass tort personal injury bankruptcy cases, this Court has "related to" jurisdiction over, and may fix venue for (and effectively transfer), all PAAs in this Court. Section 157(b)(5) specifically grants the Court authority to "order that personal injury tort and wrongful death claims . . . be tried in the

---

[2] LFL is a non-stock, non-profit corporation under the laws of the District of Columbia affiliated with the BSA that provides the BSA's Exploring program, which focuses on educational and career-oriented experiences.

[3] The PAAs also include approximately 116 claims against alleged individual perpetrators of abuse, who are named as co-defendants in certain of the PAAs—but are not represented by the BSA. Although the BSA seeks to transfer these claims pursuant to this Motion, the BSA explicitly does not wish to prevent victims of sexual abuse from pursuing their claims against these alleged individual perpetrators. To that end, the BSA is not seeking to enjoin the prosecution of claims against alleged perpetrators in its Adversary Complaint for Injunctive Relief Pursuant to Sections 105(a) and 362 of the Bankruptcy Code filed in the Debtors' chapter 11 cases, *see generally* Adversary Complaint, 20-50527, Adv. Dkt. No. 1 (Bankr. D. Del. Feb. 18, 2020), nor is the BSA seeking to enjoin any such claims through its proposed plan of reorganization, *see Chapter 11 Plan of Reorganization for the Boy Scouts of America and Delaware BSA, LLC*, Bankr. Case No. 20-10343, Dkt. No. 20, Art. X, (Bankr. D. Del. Feb. 18, 2020).

1

district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose . . . ." 28 U.S.C. § 157(b)(5). To be clear, the Debtors do not envision litigating the merits of the PAAs before this Court. Instead, the purpose of this motion is to centralize the administration of the Debtors' bankruptcy estates. The PAAs were the driving force behind the Debtors' bankruptcy filing, and centralization in this Court will drastically simplify the resolution of these claims in the Bankruptcy Court and avoid having multiple forums adjudicate different but inextricably intertwined aspects of the chapter 11 cases.

The BSA is a congressionally-chartered non-profit corporation that serves to train young men and women in responsible citizenship, character development, and self-reliance. The BSA has chartered approximately 261 Local Councils across the United States, each of which is separately incorporated under the non-profit laws of its respective state. To carry out the BSA's mission, the Local Councils organize, register and support thousands of local Chartered Organizations across the country. The Chartered Organizations, in turn, form Scouting units.

There are currently more than 275 lawsuits pending in state and federal courts across the United States asserting abuse-related claims against the BSA. The BSA cannot continue to address abuse litigation in the tort system on a case-by-case basis. In addition to the unsustainable financial cost of continuing to engage in piecemeal litigation across the country, continuing this process will result in the risk of inconsistent judicial outcomes and inequitable treatment of victims.

The Debtors have commenced the chapter 11 cases to achieve dual objectives: (1) timely and equitably compensating victims of abuse in Scouting and (2) ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission. Prolonged bankruptcy proceedings would imperil both of these objectives.

The Debtors have taken several steps to promote the expeditious and efficient prosecution of these reorganization proceedings, including commencing an adversary proceeding in the chapter 11 cases that seeks a preliminary injunction barring the prosecution of all abuse lawsuits against the BSA Parties and removing to federal court all abuse claims pending against the BSA Parties in state courts throughout the country. Among the most the important of these steps, the Debtors seek to transfer and consolidate the PAAs before one court to provide for an equitable, uniform and timely resolution thereof. Fixing venue in this Court will streamline the adjudication of claims that are integrally related to, and indeed the reason for, the Debtors' bankruptcy filings. It is only through this single, centralized forum that the interests of all stakeholders can best be served and the serious issues raised in the PAAs can be equitably, consistently, and timely resolved.

## STATEMENT OF FACTS

***Background of the BSA, Local Councils, and Chartered Organizations***. Founded in 1910, the BSA is one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world. Since its inception, it has been the BSA's mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."[4] The BSA, Local Councils and Chartered Organizations work closely together to carry out the mission of Scouting. Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance.

The BSA, through the independently incorporated Local Councils, facilitates the delivery of Scouting across the nation and overseas to U.S. citizens, including the children of military personnel stationed overseas. The BSA provides services such as core program content, the procurement and sale of uniforms and equipment, IT and digital resources, training development,

---

[4] *See* BSA, *Mission & Vision*, available at https://www.scouting.org/legal/mission/.

national events, and registration systems, among others. In addition, the BSA provides certain corporate and administrative support to the Local Councils in exchange for shared-services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission. This support includes human resources, access to training facilities, marketing services, and general insurance liability coverage. Critically, the BSA procures and administers general liability insurance coverage for the Local Councils and Chartered Organizations as it relates to their involvement in Scouting and, as described above, administers and financially supports the litigation of claims against the Local Councils and Chartered Organizations.

In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program. As noted above, there are currently 261 Local Councils, each of which is a separate non-profit corporation incorporated under the applicable state laws in which it operates. Notwithstanding their independence from the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner consistent with the BSA's mission and with the BSA's charter, bylaws, rules and regulations, policies, and guidelines. The most important functions served by Local Councils are their recruitment of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create. Local Councils also provide other services essential to Scouting, including funding local Scouting programs and initiatives; recruiting Scouts and volunteers; delivering training; and locally enforcing the BSA's policies, rules, and regulations. In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for a successful Scouting program.

Chartered Organizations assist with recruiting and vetting adult leaders and other volunteers, and provide meeting space and other monetary and in-kind support to the Scouting

4

units that they sponsor. There are currently more than 41,000 Chartered Organizations in the country. They are typically local organizations–such as faith-based institutions, clubs, civic associations, educational institutions, businesses and groups of citizens–that sponsor the more than 81,000 local Scouting units throughout the country. Some Chartered Organizations are actively involved with the units that they sponsor and use Scouting as a means to further their own mission or serve their broader communities.[5]

*The BSA's Administration of the Pending Abuse Actions*. The PAAs allege that the BSA Parties are liable for abuse arising out of the victim's involvement or connection with Scouting. Although the PAAs vary in their procedural posture, very few are close to trial and most are in either the discovery or motion-practice phase.[6] Historically, claims against the BSA Parties, including the PAAs have almost invariably been litigated and administered solely by the BSA. Declaration of Brian Whittman in Support of the Debtors' Motion to Fix Venue for Claims Related to Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), dated February 18, 2020 (the "Whittman Decl."), ¶ 16. This approach is a product of the relationship between the BSA and the non-debtor BSA Parties, and the fact that some of the key allegations made by plaintiffs in the PAAs are substantially directed at the BSA. *Id.* The BSA is necessarily involved in a wide variety of litigation matters, including, for example, responses to discovery requests. *Id.* ¶ 17. The overwhelming majority of these discovery requests are directed at the BSA, which maintains the majority of records, as opposed to any of the non-debtor BSA Parties. *Id.* In addition to responding to

---

[5] Additional information regarding the BSA's charitable mission and activities; the relationship and activities of the Local Councils, Chartered Organizations, and LFL; the structure of the BSA's shared insurance program; and the circumstances preceding the bankruptcy filings are set forth in the Debtors' Informational Brief, which was filed in the Bankruptcy proceeding. (Bankr. Case No. 20-10343, Dkt. No. 4.)

[6] As of the commencement of the bankruptcy cases, only two PAAs were scheduled for trial in the next several months; since the Petition Date, such actions have been removed from Oregon state court to Oregon bankruptcy court, where they have been set for status hearing on April 1, 2020. No trials are scheduled in any other PAA until June 2020.

discovery, the BSA facilitates the retention of joint defense counsel, coordinates with insurance carriers, and authorizes and funds the payment of any settlement amounts related to the PAAs or similar, previously resolved, claims. *Id.* at ¶ 18. Given the complexity of the issues involved in the PAAs, and the BSA's central role in litigating them, the organization has retained national coordinating counsel to oversee the handling of the ever-increasing number of claims against the BSA Parties. *Id.*

***The Bankruptcy Case and the Relief Requested***. By this Motion, the Debtors seek to consolidate before this Court the PAAs currently pending in jurisdictions throughout the country. Permitting these lawsuits to proceed in multiple forums will inevitably result in inequitable results for abuse victims based on the particular venue of the lawsuit and the timing of the filing. Instead, the Debtors request a consolidated governing forum that will treat the PAAs in an equitable and consistent manner. To provide a more efficient procedural path, the BSA has first removed each State Court Action to its corresponding federal court. By this Motion, the BSA now seeks to transfer all PAAs to this Court. Such nationwide consolidation of personal injury claims in bankruptcy is the very purpose for 28 U.S.C. § 157(b)(5).

## ARGUMENT

## I.     THE PAAs SHOULD BE TRANSFERRED TO THIS COURT UNDER § 157(b)(5).

28 U.S.C. § 157(b)(5) provides that this Court should "order that personal injury tort and wrongful death claims . . . be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose . . . ." 28 U.S.C. § 157(b)(5).[7] Courts in this District have recognized, under § 157(b)(5), their "sole authority to determine the appropriate venue for [actions alleging] personal injury tort and wrongful death claims against, among others,

---

[7] Although 28 U.S.C. § 157(b)(5) grants this Court the power to fix venue for the PAAs, the cases discussing this power use the terms "fix venue" and "transfer" interchangeably.

[non-debtors over which the court has 'related to' jurisdiction]" where the related bankruptcy is pending in the United States Bankruptcy Court for the District of Delaware. *Hopkins v. Plant Insulation Co.*, 342 B.R. 703, 708 (D. Del. 2006).

The purpose of section 157(b)(5) is "to centralize the administration of the bankruptcy estate and eliminate having multiple forums adjudicate different parts of a bankruptcy case." *See*, *e.g.*, *id.* at 716; *see also Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*, 950 F.2d 839, 845 (2d Cir. 1991) ("[T]he manifest purpose of section 157(b)(5) was 'to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case.'" (quotations omitted)); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011 (4th Cir. 1986); *In re Triad Grp., Inc.*, Case No. 13-C-1307, 2015 WL 12843204, at *3 (E.D. Wis. Feb. 17, 2015). Such centralization benefits debtors and creditors alike by streamlining the administration of the bankruptcy estate and ensuring equitable and consistent treatment of tort claimants. *See Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn. (In re Dow Coming Corp.)*, 86 F.3d 482, 496 (6th Cir. 1996) ("Dow I") (holding that transfer of claims under 157(b)(5) "increases the debtor's odds of developing a reasonable plan of reorganization which will 'work a rehabilitation of the debtor and at the same time assure fair and non-preferential resolution of the ... claims.'" (quoting *A. H. Robins Co.*, 788 F.2d at 1011)).[8]

Recognizing these benefits, courts have used § 157(b)(5) to transfer claims against debtors and non-debtors to the district court where the debtor's bankruptcy case is pending. For example, in *A.H. Robins*, the Fourth Circuit affirmed a decision centralizing thousands of state and federal

---

[8] *See also* Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. DAVIS L. REV. 1613, 1649 (2008) (noting that § 157(b)(5)'s transfer mechanism "has been effectively employed in mass tort bankruptcies such as *Dow Corning* and *A.H. Robins*, and is one of the key advantages of resolving mass tort litigation within the bankruptcy system"); Georgene Vairo, *Mass Torts Bankruptcies: The Who, the Why and the How*, 78 AM. BANKR. L.J. 93, 125 (2004) (stating that "the broad reach of the 'related to' jurisdictional provision and the transfer power, provides a very potent tool for aggregation and global resolution in connection with Chapter 11 reorganization").

personal injury cases against debtors and non-debtor co-defendants in the district court where a bankruptcy was pending, concluding that it was "obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases [all involving one brand of intrauterine device] separately," and that centralization would ensure the "fair and non-preferential resolution of the . . . claims," which was critical to "the development of a reasonable plan of reorganization for the debtor." *A.H. Robins*, 788 F.2d at 1011-14.

Likewise, the court in *In re New England Compounding Pharm., Inc. Prod. Liab. Litig.*, 496 B.R. 256 (D. Mass. 2013) ordered the transfer of personal injury claims against non-debtor affiliates of the debtor pursuant to § 157(b)(5) because such transfer was the "most efficient use of the limited resources of the judicial system, and the fairest and most efficient distribution of the assets of the estate." *Id.* at 273. The court reasoned transfer was appropriate, in part because:

> [A]llowing some state-court cases to proceed without consolidation in [one forum] create[d] the possibility of inconsistent rulings or judgments on factual or scientific issues that may greatly complicate the resolution of these matters. And litigation in multiple courts also threatens to impose significant discovery burdens, as discovery from many of the same people and entities may be sought on multiple occasions.

*Id.* at 263-64; *see also In re Montreal Me. & Atl. Ry., Ltd.*, Civil No. 1:13-MC-00184-NT, 2014 WL 1155419, at *10, 12 (D. Me. Mar. 21, 2014); *In re Nutraquest, Inc.*, No. 03-5869 (GEB), 2004 U.S. Dist. LEXIS 29143, at *42-43 (D.N.J. Mar. 5, 2004).

Here, consolidation of the PAAs will "further the prompt, fair, and complete resolution of all claims 'related to' [the Debtors'] bankruptcy proceedings, and harmonize Section 1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate." *Dow I*, 86 F.3d at 497. Specifically, consolidation of the PAAs in this Court will (1) significantly reduce the burden on the Debtors' estates and preserve assets for distribution to victims by, among other things, reducing duplicative discovery and the need to retain separate

counsel in each jurisdiction where there is a PAA; (2) bring all interested parties into a "single forum where all interests can be heard and in which the interests of all claimants with one another may be harmonized," *A.H. Robins*, 788 F.2d at 1014; and, if necessary, (3) streamline and promote the consistent, equitable, and timely resolution of the PAAs by providing a forum for resolving common threshold issues of fact and law and the admissibility of evidence. Accordingly, this Court should direct the transfer of each of the PAAs to this Court pursuant to § 157(b)(5).

## II.   THIS COURT HAS JURISDICTION OVER THE PENDING ABUSE ACTIONS.

28 U.S.C. § 1334(b) grants original jurisdiction in federal district courts over "all civil proceedings . . . related to cases under title 11." 28 U.S.C. § 1334(b). A "related to" case represents "the broadest of the potential paths to bankruptcy jurisdiction." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 163 (3d Cir. 2004). In enacting section 1334(b), "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995).

A civil action is "related to" a bankruptcy case where its outcome "could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1994). An action satisfies the "conceivable effect" test "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* "A key word in [the *Pacor*] test is 'conceivable.' Certainty, or even likelihood, is not a requirement." *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991). *Pacor*'s "conceivable effect" test asks whether the allegedly related lawsuit would affect the bankruptcy without the intervention of

yet another lawsuit. *W.R. Grace & Co. v. Chakarian*, 591 F.3d 164, 172 (3d Cir. 2009) ("W.R. Grace II") (quotation omitted).[9]

Related-to jurisdiction exists over the claims against the non-debtor BSA Parties because (1) the Debtors and non-debtor BSA Parties share an identity of interest, based upon their shared purpose and common mission and the BSA's lead role in resolving the PAAs, such that the claims against the non-debtor BSA Parties are, in effect, claims against the Debtors' estates; (2) the Debtors share significant insurance with the non-debtor BSA Parties through the BSA's shared insurance program; and (3) the claims against the non-debtor BSA Parties raise factual and legal questions that are substantially related to—and inextricably intertwined with—those raised by the claims against the Debtors.[10]

### A. The BSA Parties Share an Identity of Interest

The exercise of related-to jurisdiction over claims against non-debtors is appropriate where there is an "identity of interest" between the non-debtor co-defendants and the debtors such that the debtors may be said to be the real party in interest. *See A.H. Robins*, 788 F.2d at 1011-14. Here, the BSA Parties share an identity of interests because of (1) their shared purpose and common mission, and (2) the BSA's lead role in litigating and resolving the PAAs.

---

[9] Because the BSA's bankruptcy case is pending before the Delaware Bankruptcy Court, the BSA relies principally on the Third Circuit's interpretation of section 1334(b)'s grant of "related to" jurisdiction. However, the "any conceivable effect" test developed by the Third Circuit in *Pacor* has been endorsed by the Supreme Court and adopted by the vast majority of circuits "with little or no variation." *Celotex*, 514 U.S. at 308 n.6 (collecting cases).

[10] There is no question the claims in each of the PAAs against the BSA have a direct and immediate impact on the BSA's estate, and are therefore well within this Court's "related-to" jurisdiction. *See ConocoPhillips Co. v. SemGroup, L.P. (In re Semcrude, L.P.)*, 428 B.R. 82, 95, 100 (Bankr. D. Del. 2010) (finding claims arising out of certain oil and gas contracts (i) within core jurisdiction of bankruptcy court to the extent asserted against debtors, and (ii) within non-core, related-to jurisdiction of bankruptcy court to the extent asserted against non-debtors). The efficient resolution of all PAAs, regardless of the forum in which they were filed, is the primary focus of the bankruptcy proceedings and is critical to ensuring victims are equitably compensated and that the BSA preserves the ability to continue its mission.

### 1.       Shared Purpose and Common Mission

Courts have exercised "related to" jurisdiction over claims against non-debtor co-defendants where such claims are intimately related to a single product manufactured or service provided by a debtor. *See* Order Under Sections 105(a) and 362 of the Bankruptcy Code Extending the Automatic Stay to the Parishes to Prevent the Continuation of Certain Personal Injury Actions at 1, *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (CSS) (Bankr. D. Del. Feb. 4, 2010) ("<u>CDOW Order Extending Stay</u>") (extending automatic stay to enjoin clams against non-debtor parishes that worked with debtor to provide religious services within certain geographical boundaries); *Dow I*, 86 F.3d at 485, 492-94 (finding jurisdiction over claims against non-debtors based on debtor's role as manufacturer and/or supplier of breast implants); *see also A.H. Robins*, 788 F.2d at 996, 1014 (exercising jurisdiction and endorsing 157(b)(5) transfer of claims all arising out of use of single contraceptive device); *W.R. Grace & Co. v. Chakarian*, 386 B.R. 17, 30-32 (Bankr. D. Del. 2008) ("<u>W.R. Grace I</u>") (finding jurisdiction and noting debtors and non-debtors shared an identity of interests because debtor's conduct was "at the core" of non-debtor claims).

Although the BSA Parties are legally separate entities, each exists under and according to the terms of the BSA's congressional charter, and they work together to deliver the single charitable service of Scouting. Indeed, with respect to the traditional Scouting program, none of the BSA, the Local Councils, or the Chartered Organizations can fulfill the BSA's chartered mission without the services provided by the other two. As the national congressionally-chartered umbrella organization for the Scouting mission, the BSA is responsible for (i) chartering Local Councils and Chartered Organizations; (ii) developing core program content; (iii) managing services common to all of Scouting, such as purchase and sales, IT, leadership training, national events and facilities, and membership services; and (iv) registration. Local Councils, in turn, are the intermediary organizations that directly support individual Scouting units (such as "troops"

and "packs") by providing more localized services, including recruiting, local training, facilities and programming support. The Local Councils are also responsible for, among other things, the operation of locally owned camps, management of rank advancement and individual unit chartering. Finally, Chartered Organizations sponsor individual Scouting units and often provide meeting space and other support. Each of the three plays a distinct role in implementing the Scouting mission. When a member joins Scouting, he or she benefits from the key services provided by each of the three. Similarly, the BSA serves as the national umbrella organization that provides critical nationwide support services to LFL. LFL, in turn, is responsible for administering the Exploring program and working with local community organizations to initiate and maintain Explorer posts.

These unique relationships make this case readily distinguishable from the asbestos cases in which related-to jurisdiction has been absent because there was not such an overlap with the product or service provided by the debtor—or, as here, a common nonprofit mission. *Compare* CDOW Order Extending Stay at 1, *Dow I*, 86 F.3d at 485, 492-94, *A.H. Robins*, 788 F.2d at 996, 1014, *W.R. Grace I*, 386 B.R. at 30-32, TK Holdings Hr'g Tr. at 16:17-25, *with In re Combustion Eng'g*, 391 F.3d 190, 231-32 (3d Cir. 2005) (no related to jurisdiction where, among other things, claims arose from different asbestos products manufactured from different materials by separate entities); *In re Fed.-Mogul Glob.*, 300 F.3d 368, 372-73, 382 (3d Cir. 2002); *In re Imerys Talc Am., Inc.*, No. 19-mc-103(MN), 2019 WL 3253366, at *6-7 (D. Del. July 19, 2019). The continued ability of the Debtors to fulfill their charitable mission by delivering the Scouting programs, and any hope of the Debtors to successfully reorganize, depends on an efficient, orderly, and equitable administration of the litigation against the non-debtor BSA Parties.

### 2.     The BSA's Lead Role in Litigating Pending Abuse Actions

"Unusual circumstances" sufficient to establish related-to jurisdiction exist where "there is such identity between the debtor and the third-party [non-debtor] defendant that the debtor may be said to be the real party defendant." *A.H. Robins*, 788 F.2d at 999. Although the non-debtor BSA Parties are legally separate entities from the BSA and from each other, plaintiffs frequently name both the BSA and the non-debtor BSA Parties in lawsuits where abuse in Scouting is alleged. The majority of the PAAs involve some combination of five categories of defendants: the BSA; alleged perpetrators of abuse; a Local Council; a Chartered Organization; and LFL. *See* Motion, Ex. A.

The BSA is a co-defendant in all but a handful of the PAAs that the Debtors seek to transfer pursuant to this Motion. Moreover, with regard to nearly all of the PAAs, including those where the BSA is not a co-defendant, the BSA has been the lead—and with very limited exception the only—party litigating the PAAs on behalf of itself and the non-debtor BSA Parties. Whittman Decl. ¶ 16. This is unsurprising given the relationship between the BSA Parties and their shared insurance structure. The BSA facilitates the retention of joint defense counsel, responds to the overwhelming majority of discovery requests, coordinates with insurance carriers, and authorizes and funds any settlement amounts related to the PAAs. Whittman Decl. ¶ 18. This pattern and practice of coordinating litigation for both itself and the non-debtor BSA Parties further supports this Court's jurisdiction over the PAAs. *See In re Phila. Newspapers, LLC*, 407 B.R. 606, 615 (E.D. Pa. 2009) (finding debtors' practice of providing indemnification and defense to employees supported jurisdiction over claims against employees because such past practice made it "likely that [the debtors] would be obligated" to provide such indemnification and defense in that case).

Indeed, plaintiffs themselves routinely either (1) make no distinction between claims and allegations against the BSA and those against the non-debtor BSA Parties, *see generally, e.g.*, Declaration of Bruce A. Griggs in Support of the Debtors' Motion to Fix Venue for Claims Related

13

to Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), dated February 14, 2020 (the "Griggs Decl."), Ex. A and B; or (2) assert claims that focus substantially on the BSA's acts or omissions rather than those of other named defendants, such that the BSA is the "real party defendant." *See generally, e.g.*, Griggs Decl., Ex. C, D, E, and F.

### B. Shared Insurance Impacts the Debtors' Estates

The PAAs against the non-debtor BSA Parties are, in effect, claims against the BSA's estate's assets. Where debtors and non-debtors share from the same insurance coverage, a judgment or settlement involving the non-debtor has a direct and immediate financial impact on the debtor's estate. Jurisdiction arises in this context because shared policies are considered property of the debtor's estate, and prosecution of a claim against a co-insured non-debtor depletes proceeds available to the debtor, reducing assets available to the estate and ultimately to creditors. *See, e.g.*, *A.H. Robins*, 788 F.2d at 1008 (sustaining injunction and transfer of claims against non-debtors in part because such claims could reduce insurance available to debtor's estate); *Quigley Co. v. Law Offices of Peter G. Angelos*, 676 F.3d 45, 58 (2d Cir. 2012) ("[W]here litigation [against non-debtor] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."); *Dow I*, 86 F.3d at 494–95 ("[T]he possible depletion of insurance policies depends on contingencies sufficiently immediate to support a finding of 'related to' jurisdiction."); *In re Montreal Me. & Atl. Ry.*, 2014 WL 1155419, at *10 ("Claims against non-debtor defendants who share a policy of insurance with the debtor are related to the debtor's bankruptcy.").

The bulk of the CGL Policies provide coverage not only to the BSA, but also to each of the non-debtor BSA Parties. Whittman Decl. ¶ 12-15; *see, e.g.*, Declaration of Adrian C. Azer in Support of the Debtors' Motion to Fix Venue for Claims Related to Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), dated February 17, 2020 (the "Azer Decl."), Ex. B. As both additional

insureds and "Named Insureds," the Local Councils have the same rights as the BSA to the limits of liability under those policies; thus, the limits of liability are "shared" between the BSA and the Local Councils. Whittman Decl. ¶ 14. Similarly, the Chartered Organizations and LFL also "share" the limits of liability of the CGL Policies. Finally, LFL has since its formation also been insured under the BSA's CGL Policies and "shares" in the limits of liability thereunder to the same extent as the BSA, the Local Councils, and the Chartered Organizations. *Id.* ¶ 12 n.5; *see, e.g.*, Azer Decl. Ex. D. Importantly, while certain policies have been exhausted or settled, substantial coverage remains available to the BSA Parties for the PAAs. Whittman Decl. ¶ 10-11.

Accordingly, to the extent a claim is successfully prosecuted against the non-debtor BSA Parties, plaintiffs undoubtedly will look directly to this shared insurance to satisfy any judgment, thereby depleting, dollar-for-dollar, insurance proceeds available to the Debtors' estate. This shared insurance alone is sufficient to establish "related to" jurisdiction.

### C.  Claims Against Local Councils and Chartered Organizations are Inextricably Intertwined With Claims Against the BSA

This Court has related-to jurisdiction over all of the PAAs because the claims against the non-debtor BSA Parties are inextricably intertwined with the claims against the BSA. *See Gisinger v. Patriach*, No. 16 Civ. 1564 (ER), 2016 WL 6083981, at *3 (S.D.N.Y. Oct. 18, 2016); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990). Here, the claims in each of the PAAs against the non-debtor BSA Parties are inextricably intertwined with the claims against the BSA because (1) each claim raises substantially similar questions of fact and law such that the BSA would be required to participate, notwithstanding the automatic stay, to protect its interests and avoid the risks of collateral estoppel and record taint; and (2) notwithstanding the automatic stay, the BSA will inevitably be required to participate in the PAAs including by responding to discovery requests.

**1.   The PAAs Arise Out of a Common Nucleus of Claims and Allegations and Raise Substantially Similar Questions of Fact and Law**

The BSA's risk of collateral estoppel, record taint, evidentiary prejudice or the application of preclusion doctrines—should the PAAs be permitted to proceed against the non-debtor BSA Parties—is sufficient to confer related-to jurisdiction over the PAAs. Courts have long acknowledged that related-to jurisdiction exists over claims against non-debtor co-defendants where there is a plausible risk that key legal and factual determinations related to such claims may be binding on the debtor in subsequent litigation through the application of collateral estoppel. *See Union Tr. Phila., LLC v. Singer Equip. Co.*, 460 B.R. 644, 657 (E.D. Pa. 2011) (finding related to jurisdiction where the debtor was at risk of being "bound to critical factual and legal issues determined in those proceedings by operation of collateral estoppel"); *see also In re Phila. Newspapers*, 407 B.R. at 615 ("[I]f the suit against the Non-Debtors proceeded without the involvement of the [debtors], the [debtors] may be later barred from defending [those] claims by operation of collateral estoppel."); *Majestic Star Casino, LLC v. City of Gary (In re Majestic Star Casino, LLC)*, Adv. No. 10-50841 (KG), 2010 WL 2540457, at *2 (Apr. 24, 2010) (Mem. Order.) (extending automatic stay to claims against non-debtors where, "adverse rulings in the [non-debtor litigation] may have a preclusive effect on the Debtors' case against the City"); *In re Am. Film Techs., Inc.*, 175 B.R. at 849-55 (finding that collateral estoppel applied in bankruptcy cases against debtor, and extending automatic stay to claims against debtor's directors and officers because of likely effect of collateral estoppel). Indeed, "collateral estoppel concerns would require the debtor to defend the actions as fully as if it were a named defendant" and would thereby effectively negate the breathing spell created by the automatic stay. *Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)*, 175 B.R. 847, 851, 855 (Bankr. D. Del. 1994).

16

Here, the BSA faces a real risk of being bound by factual findings and legal determinations in the PAAs against the non-debtor BSA Parties in at least two respects. First, the overwhelming majority of PAAs contain claims against the BSA and one or more non-debtor BSA Parties arising from a common nucleus of key facts that raises overlapping legal issues. Thus, within any given Pending Abuse Action, the litigation of a claim against a non-debtor BSA Party would effectively decide legal or factual issues that could result in a binding determination with respect to claims against the BSA. This would leave the BSA in the position of either (1) forfeiting the protection of the automatic stay and being forced to participate in order to protect its own interests, or (2) risking being unfairly prejudiced by evidentiary rulings, factual findings, or legal determinations rendered therein, while attempting to equitably resolve *those very claims* in the chapter 11 cases.

Moreover, the PAAs raise a number of key, common threshold issues. For example, common questions remain regarding which assets of the estate are available to satisfy creditor claims, the estimation of assets and liabilities, the propriety of extending statutes of limitations, and the admissibility of certain evidence. Such issues are at the core of a significant number of claims against the BSA and those against the BSA Parties. If the claims against the non-debtor BSA Parties are permitted to go forward in their local state or federal courts without the BSA and without transfer to this Court, the BSA would face the risk of being bound by multiple, and invariably inconsistent, determinations of these threshold issues that may result in enormous liability for the BSA's estate and an inequitable distribution of the estate's assets to victims.

### 2. The BSA Is a Necessary Participant in Any Ongoing Litigation Against Local Councils and Chartered Organizations

As a practical matter, none of the PAAs can feasibly proceed without the active, and substantial, participation of the BSA. Courts have routinely exercised their related-to jurisdiction over claims against non-debtor co-defendants where it is clear that the prosecution of such claims

will inevitably involve substantial participation of the debtors and divert critical resources away from the estates and the efficient resolution of a bankruptcy case. *See Gillman v. Cont'l Airlines, Inc.*, 177 B.R. 475, 481 (D. Del. 1993) (exercising jurisdiction and extending automatic stay to non-debtors where non-debtors were "heavily involved" in the debtor's restructuring efforts and litigation would detract from reorganization efforts); *see also Nev. Power Co. v. Calpine Corp.*, 365 B.R. 401, 412 (S.D.N.Y. 2007) (enjoining actions against a non-debtor where the debtor "would suffer irreparable harm if [a key employee] were distracted from his responsibilities in order to participate" in ongoing litigation); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-CV-5358, 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006); (affirming the injunction of actions against a non-debtor where "the logistical stress on [the debtor] from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the State Court Action threatened to irreparably impair the company's reorganization process").

Section 362(a) of the Bankruptcy Code stays the continuation of proceedings the BSA, but its stay would be illusory if litigants could nonetheless move forward against the non-debtor BSA Parties. For decades, the BSA and its personnel have managed all litigation on behalf of itself and the non-debtor BSA Parties. Whittman Decl. ¶ 16. With few exceptions, the BSA holds, manages and produces the majority of the documentation relevant to the defense of all known claims. Whittman Decl. ¶ 19. The substantial discovery burden, on its own, inherent in litigating the hundreds of PAAs in courts across the country, would result in significant diminution in the value of the Debtors' estates, thereby destroying value that would otherwise be distributable to creditors, including abuse victims. The BSA would be required to engage fully in litigating on behalf of the non-debtor BSA Parties, even as it attempts to resolve claims against itself in its bankruptcy cases.

Its involvement would include forming defense strategies, assisting in discovery, attending depositions, and a myriad of other litigation tasks. Whittman Decl. ¶ 19.

Furthermore, this ongoing litigation in courts around the country—regardless of whether the litigation is nominally directed at non-debtor co-defendants—will distract key personnel at the BSA from the critical task of negotiating with parties-in-interest to obtain an agreeable plan of reorganization that timely and equitably compensates victims and fairly treats other stakeholders. Whittman Decl. ¶ 20. Specifically, the BSA's Chief Financial Officer and General Counsel must review, analyze, and approve settlements, strategies, and expenses with respect to the PAAs. Whittman Decl. ¶ 22. In addition, the BSA's claims team members are responsible for monitoring and evaluating the status of the PAAs, and the Director of Youth Protection and others are often required to testify in depositions in the PAAs. *Id.*

Forcing the BSA to dedicate resources toward litigating cases that have been brought against other BSA Parties would only prolong the Debtors' chapter 11 cases and detract from the real goal: a consensual plan of reorganization that equitably compensates victims and allows the Debtors to continue their important work.

## III.     THIS COURT SHOULD NOT ABSTAIN FROM EXERCISING ITS JURISDICTION.

Abstention would run counter to the prompt, efficient and equitable administration of the Debtors' estates, particularly in the context of the personal injury nature of the PAAs. Although a district court ordinarily may abstain from proceedings related to a bankruptcy case "in the interest of justice, or in the interest of comity with State courts or respect for State law," 28 U.S.C. § 1334(c)(1), it is questionable whether such permissive abstention is proper in connection with a § 157(b)(5) transfer.[11] The plain language of § 157(b)(5) is mandatory: "the district court *shall order*

---

[11] Mandatory abstention is inapplicable in this case, as 28 U.S.C. §§ 157(b)(4) and (b)(2)(B) together provide that §

that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." 28 U.S.C. § 157(b)(5) (emphasis added). Neither the statutory text nor the legislative history suggests any basis on which a district court deciding a §157(b)(5) motion can abstain from hearing the claims sought to be transferred thereby, leaving such claims in state court. *See In re Pan Am. Corp.*, 950 F.2d at 845 (noting that "the language of section 157(b)(5) appears to be mandatory" and that permissive abstention may "contraven[e] the legislative history").

Moreover, even if permissive abstention were properly considered in the context of a 157(b)(5) motion, abstention should be the rare exception to the rule that federal courts have a "virtually unflagging obligation" to exercise their jurisdiction and "may abstain only for a few 'extraordinary and narrow exception[s].'" *Welded Constr., L.P. v. The Williams Cos. (In re Welded Constr., L.P.)*, 609 B.R. 101, 112 (Bankr. D. Del. 2019). This "virtually unflagging obligation" is particularly acute in the context of § 157(b)(5), which is specifically designed to centralize the administration of claims related to a bankruptcy case in a single federal forum. *In re Nutraquest, Inc.*, 2004 U.S. Dist. LEXIS 29143, at *43.  Indeed, this is precisely why "[t]ransfer should be the rule, abstention the exception" under § 157(b)(5). *In re Pan Am. Corp.*, 950 F.2d at 845.

## CONCLUSION

For the foregoing reasons, this Court should grant the BSA's Motion and fix venue in this Court to enable an efficient, consolidated adjudication of the Pending Abuse Actions.

---

1334(c)(2) does not apply to the liquidation of personal injury or wrongful death claims against a debtor's estate. Even if a mandatory abstention analysis *could* apply, § 1334(c)(2) requires remand only where: (1) although related to a Title 11 case, the claim does not arise under Title 11 or arise in a Title 11 case; (2) the claim could not have been commenced in federal court but-for the jurisdictional basis afforded by Section 1334; *and* (3) the state court can timely adjudicate the claim. 28 U.S.C. § 1334(c)(2). The State Court Actions do not satisfy these requirements.

Dated: March 3, 2020
      Wilmington, Delaware

SIDLEY AUSTIN LLP
Jessica C. K. Boelter
William Curtin
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Email: jboelter@sidley.com
       wcurtin@sidley.com

– and –

SIDLEY AUSTIN LLP
Thomas A. Labuda
Michael C. Andolina
William A. Evanoff
Matthew E. Linder
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Email: tlabuda@sidley.com
       mandolina@sidley.com
       wevanoff@sidley.com
       mlinder@sidley.com

– and –

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donna L. Culver*
Donna L. Culver (No. 2983)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dculver@mnat.com
       dabbott@mnat.com
       aremming@mnat.com
       jbarsalona@mnat.com
       ptopper@mnat.com

*PROPOSED ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION*